416

Rhodia CHIMIE and Rhodia
Inc., Plaintiffs,

v.

PPG INDUSTRIES, INC., Defendant.

No. CIV.A.01–389–KAJ.

United States District Court,
D. Delaware.

Oct. 8, 2003.

Rudolf E. Hutz, Esquire, N. Richard Powers, Esquire, Connolly, Bove, Lodge & Hutz, Wilmington, DE, for plaintiffs. Of Counsel: Eric H. Weisblatt, Esquire; Norman H. Stepno, Esquire; B. Jefferson Boggs, Jr.; Todd R. Walters, Esquire; Scott W. Cummings, Esquire; and Erin M. Dunston, Esquire, Burns, Doane, Swecker & Mathis, L.L.P., Alexandria, Virginia.

William J. Marsden, Jr., Esquire, Timothy Devlin, Esquire, Fish & Richardson, P.C., Wilmington, DE, for defendant. Of Counsel: John M. Skenyon, Esquire; and Jolynn M. Lussier, Esquire; Fish & Richardson, P.C., Boston, Massachusetts.

## MEMORANDUM OPINION

JORDAN, District Judge.

This is a patent infringement case involving U.S. Patent No. 6,013,234 (issued January 11, 2000) (the " '234 patent"), which pertains to precipitated silica particulates useful in certain industrial applications. Before me are discovery disputes stemming from a request by plaintiffs Rhodia Chimie and Rhodia Inc. (collectively "Rhodia") for an order compelling defendant PPG Industries, Inc. ("PPG") to disclose information that PPG asserts is either irrelevant or subject to the attorney-client privilege and work product protection or both. (Docket Items ["D.I."] 180, 185.) The parties and I discussed the disputes during a teleconference on July 18, 2003 (D.I.184), and I requested submissions from the parties outlining the legal bases for

the positions taken during the teleconference. (*Id.* at 22, 31, 36.)

By the end of the teleconference, the points in dispute were narrowed to three specific matters: (1) whether PPG's reliance on an advice-of-counsel defense to a charge of willful infringement waived PPG's attorney-client privilege and its counsel's work product protection for information relating to foreign counterparts to the '234 patent (*id.* at 15–16, 21–22); (2) whether PPG should be required to create a privilege log for documents substantially pre-dating the issuance of the '234 patent and PPG's knowledge of that patent (*id.* at 28–30); and (3) whether one particular PPG document, an exchange of e-mails identified by Bates No. 000766 and referred to by the parties as the "rocks" document, which PPG asserts was produced inadvertently, is privileged and should be returned to PPG (*id.* at 32–36).[1] For the reasons that follow, I will not require PPG to produce privileged material relating to foreign counterparts of the '234 patent, I will require PPG to provide a privilege log pertaining to the '234 patent which reaches back to 1981, and I will not require Rhodia to return the "rocks" document to PPG.

## I. *Scope of Waiver*

The first issue, regarding waiver of attorney-client privilege and work product protection for information relating to foreign counterparts of the patent in suit, consists of two sub-issues: first, whether the scope of waiver with respect to the advice PPG received regarding the '234 patent extends to advice PPG received regarding foreign counterparts to the '234 patent, and, second, if so, whether it encompasses attorney work product that was never provided to PPG.

In few, if any, areas of the law has the tail taken to wagging the dog as vigorously as in the privilege waiver disputes endemic to patent infringement cases. Defendants often rely upon an advice-of-counsel defense when confronting the threat of enhanced damages

---

1. Arguments have a tendency to expand and multiply, if lawyers are left to their own devices, and Rhodia's contentions have done so since the teleconference. (*See* D.I. 180, 181, 186.) In Rhodia's *post-teleconference submissions*, they claim that there are now six issues on the table, encompassing further demands for documents that PPG claims are privileged. The present opinion is largely confined to the issues discussed during the teleconference, with confidence that the guidance provided should resolve the other matters raised by Rhodia.

for willful infringement. The consequent waiver of privileges and protections that the advice-of-counsel defense entails, however, is now the basis of innumerable disputes like the one at bar, distracting the court and the parties from addressing the fundamental questions of infringement and validity. It seems that a whole subspecialty of opinion practice has developed as part of infringement defense strategy. Litigation resources are heavily invested in delaying the moment when an accused infringer must choose between relying on advice of counsel or maintaining typical privileges, or in seeking bifurcation on the issue of willfulness, or in trying to control the scope of waiver, once the advice-of-counsel route is taken.[2]

## A. Waiver as to Foreign Counterparts

■ The scope of waiver is a particularly frequent point of contention. In this case, however, Rhodia has put an unusual spin on the issue. Rhodia asserts not only the more common claim that the waiver encompasses both attorney-client privileged material and information subject to work product protection, but also that the waiver extends beyond the patent in suit to foreign counterparts. According to Rhodia, the "[w]aiver of privilege with respect to one U.S. patent may extend to other closely-related U.S. patents[,]" because information by the alleged infringer about the related patents "may be inconsistent with information obtained about the primary patent[,]" and the alleged infringer's reaction to that inconsistent information "is relevant to the potential infringer's state of mind and good faith reliance on

2. One hopes that the occurrence of this expensive feature in patent litigation will be reduced after the United States Court of Appeals for the Federal Circuit takes an *en banc* look at its "precedent concerning the drawing of adverse inferences, with respect to willful patent infringement, based on the actions of the party charged with infringement in obtaining legal advice, and withholding that advice from discovery." *Knorr–Bremse Systeme v. Dana Corp.*, 344 F.3d 1336, *per curiam* order (Fed.Cir.2003). But the day of clarification is somewhere in the future and the present parties require an answer now.

3. This decision does not, however, mean that information referring to attorney-client communications involving the '234 patent is shielded from discovery simply because it is in files asso-

opinion of counsel." (D.I. 180 at 4; citing *Viskase Corp. v. American Nat'l Can Co.*, 888 F.Supp. 899 (N.D.Ill.1995).) Rhodia then extends that proposition by asserting that the same logic "applies with equal force to closely related counterpart patents." (D.I. 180 at 5.)

I am unpersuaded by that reasoning. The power of a charge of willful infringement to knock down privileges that are, in most contexts, regarded with the utmost respect is alone a matter of considerable concern. (*See* supra n. 2.) To amplify the potency of the charge seems unwise when the only justification for doing so is the off-chance that some information may turn up that is inconsistent with previously revealed and otherwise privileged material regarding the patent in suit. Beyond that general concern, I am specifically troubled by the notion that privileges involving foreign rights should be lightly cast aside to satisfy the voracious appetite for willfulness discovery in litigation over a U.S. patent. One ought to tread carefully when disregarding privileges, and perhaps with extra caution when the privileges are based on legal work done to determine the boundaries of rights granted by foreign sovereigns. Rhodia has failed to cite a single case to support such a sweeping scope for the waiver of privilege concerning a U.S. patent, and I decline to provide the first.[3]

## B. Waiver as to Work Product

■ Having determined that the scope of waiver does not extend to privileged information regarding foreign counterpart patents, addressing the second sub-issue raised by

ciated with foreign counterparts. Any such privileged documents must be turned over to Rhodia. To the extent there is an arguable basis for asserting that a document pertaining to the '234 patent is not subject to discovery, it must be appropriately logged. (*See infra* at 12.) Similarly, if information pertaining to the '234 patent is contained in opinions or other communications on related U.S. patents and U.S. patent applications, those communications must be turned over or, if a basis for privilege remains, logged. The scope of waiver "is defined by the subject matter discussed" in the communications regarding the '234 patent. *See Allergan Inc. v. Pharmacia Corp.*, 2002 WL 1268047 at *2 (D.Del. May 17, 2002).

Rhodia's scope-of-waiver argument, i.e., whether PPG's waiver encompasses both the attorney-client privilege and work product protection, would appear superfluous. However, because Rhodia continues to assert that it is entitled to further explore the work product of PPG's counsel, I will venture into the conflicting precedent that has grown up around the issue.

▮ District courts have taken a variety of approaches to determining the scope of the waiver inherent in an advice-of-counsel defense.[4] Within this district alone at least three different approaches have developed. In *Thorn EMI North America, Inc. v. Micron Technology*, 837 F.Supp. 616 (D.Del. 1993), the court held that the underlying rationale for requiring a waiver of the attorney-client privilege by an accused infringer relying on an advice-of-counsel defense is that the patentee is entitled to explore the mind set of the accused infringer. *Id.* at 621 ("Documents and testimony relating to that advice are relevant in that they are probative of the alleged infringer's intent."). The court went on to state, however, that the same rationale does not justify expanding the scope of the waiver to encompass the work product associated with counsel's advice if that work product was never communicated to the client. *Id.* at 622 ("Counsel's mental impressions, conclusions, opinions, or legal theories are not probative of [the client's] ... state of mind unless they have been communicated to that client."). Accordingly, the court held that reliance on advice of counsel as a defense to a charge of willful infringement did effect a waiver of the attorney-client privilege but not of the protection typically afforded an attorney's work product.

Stating that "there is no such thing as a 'law of the district[,]' " another judge within this district declined to follow the *Thorn* case. *Mosel Vitelic Corp. v. Micron Technology, Inc.*, 162 F.Supp.2d 307, 311 (D.Del. 2000) (quoting *Threadgill v. Armstrong World Industries, Inc.*, 928 F.2d 1366, 1371 (3d Cir.1991)). In an effort to avoid what it viewed as incentives to dishonesty or ineptitude in the creation of opinion letters, the *Mosel* court refused to maintain the protection of the work product doctrine, reasoning that

> by limiting the waiver of privilege only to those matters which are communicated to the client, *Thorn* and its progeny have effectively encouraged patent counsel to place only the most favorable version of the facts and the law in their opinion letters, even if these attorneys are aware of other information which is far less helpful to their client.

*Mosel*, 162 F.Supp.2d at 312. The court asserted that the attorney's work product would be relevant to the mind set of the accused infringer as well, saying,

> [i]t would be ... irrational to assume that there could be no relationship between what counsel really thought was reflected in [their] private papers and what [counsel] in fact communicated to [the] client. In this important sense, evidence about what really was in the lawyer's mind could be quite relevant to what really was in the client's mind.

*Id.* (quoting *Electro Scientific Indus., Inc. v. General Scanning, Inc.*, 175 F.R.D. 539, 545 (N.D.Cal.1997)).

Finally, in *Novartis Pharmaceuticals Corp. v. Eon Labs Manufacturing, Inc.*, 206 F.R.D. 396 (D.Del.2002), another judge re-

---

4. There is some question of whether the scope of waiver effected by reliance on an advice-of-counsel defense is a matter to be governed by Federal Circuit or regional circuit case law. *Compare Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, 276 F.Supp.2d 1084, 1092–93 (D.Nev.2003) (regional circuit law controls) *with Steelcase, Inc. v. Haworth, Inc.*, 954 F.Supp. 1195, 1197–98 (W.D.Mich.1997) (Federal Circuit law controls). The better reasoned approach recognizes that questions of waiver are not unique to patent law and are a matter of either state law, as to claims and defenses that arise under state law, or prece-

dent from the regional circuits. *See Aspex*, 276 F.Supp.2d at 1092–93 ("Although the defense of reliance on advice of counsel to an allegation of willful infringement is an issue that appears unique to patent litigation, reliance on the advice of counsel defense, in general, is not."); *cf. Rhone–Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 861 (3d Cir.1994) ("As the claims and defenses ... arise under state law, Federal Rules of Evidence 501 and 1101(c) provide that we should apply state law in determining the extent and scope of the attorney-client privilege.")

jected the premise that "the analysis for this discovery issue should focus only on the accused infringer's state of mind ... [,]" and was instead persuaded that "the starting point for the analysis is the infringer's decision to waive the attorney-client privilege." *Id.* at 398. Observing that the word waiver is defined as a "voluntary, intentional relinquishment of a known right[,]" *id.* (quoting *Black's Law Dictionary* 1417 (5th ed.1979)), the court stated that reliance on an advice-of-counsel defense constitutes an express waiver of both the attorney-client privilege and the work product doctrine. *Id.*

■ Such varying approaches to the scope of waiver are, of course, a matter of consternation to attorneys and their clients. They quite rightly want to know the boundaries within which to operate, because "[a]n uncertain privilege—or one that purports to be certain, but rests in widely varying applications by the courts—is little better than no privilege." *Rhone–Poulenc,* 32 F.3d at 863 (quoting *In re von Bulow,* 828 F.2d 94, 100 (2d Cir.1987)). But resolution of the divergent approaches on this issue will require the intervention of a higher authority. In the meantime, while I have the greatest respect for my colleagues in this district, my duty now is to apply the law as fairly and logically as I understand it. On that basis, I adopt the approach taken in *Thorn* and hold that a waiver of the attorney-client privilege does not, in and of itself, constitute a waiver of the protections afforded by the work product doctrine.

*Thorn* correctly recognizes that the root of the reason for finding a waiver of the attorney-client privilege is the need to explore the client's mind set. Because the inquiry is the client's willfulness, "the matter of consequence is the alleged infringer's state of mind." *Thorn,* 837 F.Supp. at 621. That logic is not overcome by the concern expressed in *Mosel* about the quality of attorney work product. *See Mosel,* 162 F.Supp.2d at 312 ("*Thorn* effectively encourages patent attorneys to deliberately omit damaging information from their opinion letters in order to insulate their clients from a finding of willful infringement."). The *Mosel* court's concern becomes relevant to the client's mind set only if two possibilities are considered. The first possibility is that of a lawyer willing to falsely assert that he or she has turned over all communications between counsel and client bearing on the issues in the opinion letter, while secretly holding back "what [counsel] in fact communicated to the client." *Id.* The second possibility, which seems implicit in the *Mosel* opinion, is that the system of obtaining opinion letters regarding infringement and validity has become so corrupt that clients and attorneys both know, without any need to communicate it to one another, that what the client really wants is a false or misleading opinion that hides the true findings and opinions of the attorney. *See id.* at 312–13 ("This court does not believe that the law should encourage or reward ... the creation of opinion letters that, while facially valid, are 'fraught with ineptitude [or] error' in an effort to protect the client."). Since both of those possibilities rest on the assumption of mendacity in lawyers or clients or both, it appears unlikely that a policy that opens the lawyer's files to an adversary will cure the problem. On the contrary, the fundamental dishonesty which is assumed would not lead counsel to keep honest files, where the truth lies. Such dishonesty would simply drive the "real" information and the decision to be dishonest deeper into the shadows.

■ I do not believe that a general rule of waiver that assumes deceit and gives lawyers an incentive to keep incomplete or misleading files will either satisfy the legitimate discovery interests of the parties to an infringement action or solve the problem of perverse incentives confronting opinion writers with an eye on litigation. The better course is, it seems, to recognize that an attorney's work product should be accorded "almost absolute protection from discovery[,]" because of "the adversary system's interest in maintaining the privacy of an attorney's thought processes and in ensuring that each side relies on its own wit in preparing their respective cases." *Haines v. Liggett Group Inc.,* 975 F.2d 81, 94 (3d Cir.1992) (citation omitted). In thus respecting the protections of the work product doctrine as a general rule, it is more likely that counsel's files will be a foundation for

well informed and properly memorialized advice and that, on those occasions when it is necessary to open those files to scrutiny, something honestly reflecting counsel's thought processes will be there for review.[5]

■ For similar reasons, I will not adopt the holding in *Novartis* that a knowing waiver of the attorney client privilege is *ipso facto* a decision to waive the protections of the work product doctrine. It does not follow that a waiver of the one necessarily means, or ought to mean, a waiver of the other. That approach "fail[s] to consider that the protection stemming from the work product doctrine belongs to the professional, rather than the client, and that the efforts to obtain disclosure of opinion work product should be evaluated with particular care." *Rhone–Poulenc*, 32 F.3d at 866. The attorney-client privilege and the work product doctrine are based on different public policies, protect different though frequently complementary interests, and are subject to different analyses when considering the propriety of a finding of waiver. *Cf. Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 486–87 n. 17, n. 18, n. 19 (3d Cir.1995) (court repeatedly emphasizing that, had argument been made on work product grounds, a different analysis would be required and perhaps a different result obtained than was under attorney-client privilege analysis). Neither legal protection is well served by conflating the analysis of the two.

In sum, Rhodia has already received the attorney-client communications associated with the patent in suit. It is not entitled to receive privileged materials regarding foreign counterparts, nor is it entitled, on the present record, to documents reflecting the work product of PPG's counsel.[6]

**5.** This, of course, is not to say that there will never be circumstances that may warrant an abrogation of the work product protection. *Cf. Eco Manufacturing LLC v. Honeywell Internat'l, Inc.*, No. 1:03–cv–0170–DFH, 2003 WL 1888988 at *5 n. 2 (S.D.Ind. Apr.11, 2003) (citing determination in *Michlin v. Canon, Inc.*, 208 F.R.D. 172, 173–74 (E.D.Mich.2002) that work product was properly subject to discovery because counsel had been "less than forthcoming with the court"); *Cytyc Corp. v. Autocyte, Inc.*, C.A. No.

## II. *Privilege Log*

■ The '234 patent has a long prosecution history. Its foreign priority date is listed as April 13, 1979. The first related U.S. application listed in the patent is dated April 14, 1980. After a series of abandoned continuation applications, the patent finally issued on January 11, 2000. Rhodia asserts that PPG has long known of the technology upon which the '234 patent is based. (D.I. 180 at 2.) According to Rhodia, PPG learned of the technology in 1981, during a visit to the European facilities of Rhodia's predecessor in interest. (*Id.*) Rhodia has obtained from PPG a memorandum specifically referring to that 1981 site visit and the impression left on PPG representatives by technology features which are now apparently embodied in the '234 patent. (*See* D.I. 180 at Attach. B.) A PPG representative stated in that memorandum that Rhodia's predecessor would not license the technology but that "knowledge gained regarding [the predecessor's] silica position will assist PPG in formulating their own general plans." (*Id.* at 0028831.) In Rhodia's view, the memorandum and later documents indicating PPG's concern over lost market share due to the allegedly superior Rhodia technology prove that PPG's awareness of the technology and its plans to circumvent Rhodia's intellectual property rights pre-dated the issuance of the '234 patent. (*See* D.I. 180 at 2, 5.) PPG, of course, asserts that pre-patent activity is not pertinent to a willfulness analysis since knowing about Rhodia's technology is entirely different from knowing about a patent. (D.I. 185 at 2.)

■ PPG is correct that, in general, only behavior occurring after a patent is issued is relevant to a willfulness inquiry. However, "although willfulness is generally based on conduct that occurred after a patent issued, pre-patent conduct may also be used to sup-

99–610–SLR, Mem. Order at 2–3 (D.Del. Sept. 13, 2000) (client's decision to engage as trial counsel the same counsel who rendered opinions warranted broadening scope of waiver).

**6.** To the extent such materials have already been provided to Rhodia, the court will not try to "unring the bell." They are now subject to appropriate use in this case.

port a finding of willfulness." *Minnesota Min. and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1581 (Fed. Cir.1992) (citation omitted). Where there is particularly egregious behavior showing a party intent on misappropriating a competitor's proprietary technology, courts have been willing to consider that behavior as evidence of willfulness, even if some of the offending acts occurred before a patent issued. *See id.* (willfulness finding properly rested in part on actions to misappropriate trade secrets prior to issuance of patent); *Milgo Electronic Corp. v. United Business Communications, Inc.*, 623 F.2d 645, 666 (10th Cir.1980) (infringer's pre-patent "copying activities evidenced that its conduct in manufacturing and selling infringing modems after [the patent] was intentional and deliberate, in willful disregard of Milgo's rights, rather than merely accidental or negligent[,]" and was therefore relevant to willfulness inquiry); *cf. Emory University v. Glaxo Wellcome Inc.*, 45 U.S.P.Q.2d 1534, 1536, 1997 WL 854942 (N.D.Ga.1997) (distinguishing *Milgo* because it "involved an elaborate and detailed copying scheme whereby a corps of engineers worked in secrecy for two years attempting to obtain the secret of Milgo's invention[,]" and because the plaintiff before the court had "failed to demonstrate that the egregious conduct demonstrated by the defendants in *Milgo* exists here").

In the present case, Rhodia has shown that there is at least enough smoke to warrant further inquiry into whether the fires of misappropriation were already stoked at PPG before the '234 patent issued. It is true that competitors regularly track one another's technology and that fact, in and of itself, is nothing nefarious. But documentation already revealed in this case indicates an intense interest by PPG in the Rhodia technology behind the '234 patent and a concern for loss of market share if the technology could not be countered. (*See* D.I. 180 at 2.) At a

minimum it is appropriate, under these circumstances and despite the magnitude of the labor, for PPG to log all arguably relevant documents for which it claims privilege dating from the time of PPG's 1981 review of Rhodia's predecessor's technology in Europe. I am aware that this is a daunting task,[7] but the length of PPG's involvement in seeking to understand the now patented technology and to make its own plans based upon Rhodia's technology is a historical fact that has potential relevance in this case. PPG will prepare the log.

### III. The "Rocks" Document

One of the documents that raises concern that PPG's alleged infringement was willful is the document that PPG is most eager to recover from Rhodia. It is a one page exchange of e-mails in which PPG insiders, attorneys and business executives, discuss Rhodia's technology and contrast it with results achieved when silica is produced as granules, or "rocks." PPG's main basis[8] for asserting that the "rocks" document is privileged is that it predates the issuance of the patent.

For the reasons already stated, I find that the "rocks" document may in fact have relevance in the case and that any privilege with respect to it has been waived. Moreover, as pointed out by Rhodia (D.I. 181 at 1–2), PPG sought recovery of this document approximately a year and a half ago. The judicial officer then assigned to the case ruled against PPG. (*See* 181 at Ex. B, transcript of 4/29/02 teleconference, at 21–22.) Though PPG indicated an intention to seek reconsideration of that ruling, it never did so. Local Rule 7.1.5 governs requests for reconsideration. PPG's efforts to recover the "rocks" document at this late stage are not in accordance Rule 7.1.5 and the policy underlying it, namely, repose. Accordingly, PPG's request

---

7. The costs associated with searching for documents over such an extended period are open to further discussion. It may be that some cost sharing is warranted. *Cf. Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 287–91 (S.D.N.Y. 2003) (discussing in context of electronic discovery factors to be considered in determining whether cost-shifting is appropriate).

8. PPG also claims that the document is irrelevant because it refers to a PPG product that is not at issue in this case. That may reduce its relevance, but it does not eliminate it, at least not at this stage of the case.

to have the document returned will be denied.

## IV. *CONCLUSION*

For the foregoing reasons, I will deny Rhodia's request to compel PPG to produce privileged documents pertaining to foreign counterparts of the '234 patent and to produce attorney work product, I will grant Rhodia's request to require PPG to prepare an expanded privilege log, and I will deny PPG's request for the return of the "rocks" document. An appropriate order will issue.

## *ORDER*

The court having considered the parties' positions with respect to the discovery disputes discussed by teleconference with the court on July 18, 2003,

IT IS HEREBY ORDERED that:

1. Rhodia's request to compel PPG to produce privileged documents pertaining to foreign counterparts of the '234 patent and to produce attorney work product is DENIED;

2. Rhodia's request to require PPG to prepare an expanded privilege log is GRANTED; and

3. PPG's request for the return of the "rocks" document is DENIED.