MARTIN MARIETTA MATERIALS, INC., Plaintiff,

v.

BEDFORD REINFORCED PLASTICS, INC., West Virginia University Research Corporation, and Hota V. Gangarao, Defendants.

No. CIV.A. 3:03–57J.

United States District Court, W.D. Pennsylvania.

March 31, 2005.

---

James M. Singer, Esq., Pepper Hamilton LLP, Pittsburgh, PA, for plaintiff.

## MEMORANDUM OPINION AND ORDER

GIBSON, District Judge.

This case comes before the Court on Bedford Reinforced Plastics, Inc.'s (hereinafter "Bedford") Motion to Compel 1) The Production of Documents Based on Waiver of Privilege and 2) The Continued Deposition Once the Underlying Documents are Produced. (Document No. 88–1). Upon consideration of Bedford's motion, Martin Marietta Materials, Inc.'s (hereinafter "Plaintiff") Reply to Bedford's Motion to Compel (Document No. 91–1), relevant case law and the record in the case *sub judice,* the Court grants Bedford's motion for the following reasons.

## JURISDICTION

Jurisdiction of this civil action is proper in the United States District Court for the Western District of Pennsylvania pursuant to 35 U.S.C. §§ 1 *et seq.,* Patent Laws of the United States ("Patent Act"), and this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338 based on federal question jurisdiction. Furthermore, venue is proper in this District Court pursuant to 28 U.S.C. §§ 1391 and 1400 for alleged acts of infringement committed in this judicial district. (Document No. 1).

## BACKGROUND

On March 17, 2003, the Plaintiff filed an action in this Court alleging that Bedford Reinforced Plastics, Inc., West Virginia University Research Corporation, and Hota V. GangaRao (hereinafter "Defendants") infringed two patents, namely, U.S. Patent Nos. 6,467,118 (hereinafter the " '118 patent") and 6,070,378 (hereinafter the " '378 patent").[1] (Document No. 1). Plaintiff is the assignee of both United States patents at issue in the case *sub judice,* i.e., the '118 patent and the '378 patent (collectively, "Patents–in–Suit"). The '378 patent issued on June 6, 2000, from Application No. 09/139,566, filed on August 25, 1998. (Document Nos. 30 & 94). The '118 patent issued on October 22, 2002, from Application No. 09/886,219, filed on June 22, 2001. *Id.* Both patents are drawn to a load bearing deck structure made from at least one "sandwich panel" formed of a "polymeric matrix composite material". (Document No. 1). Specifically, the Plaintiff asserts that the Defendants have been infringing and continue to infringe the Patents–in–Suit by "making,

---

1. The Court observes that the Plaintiff filed the above-captioned civil action prior to this Court's adoption of the Local Rules of Practice for Patent Cases, effective January 1, 2005. The Court has determined that it will not apply the 2005 Local Rules of Practice for Patent Cases based upon the following considerations: this case has been pending for approximately two years; the procedural posture of the action is at the claim construction stage; the adoption of the current Local Rules of Practice for Patent Cases at this procedural posture of the case would result in increased costs for the parties; and the parties generally request that this Court not apply the 2005 Local Rules of Practice for Patent Cases. Accordingly, the Court will continue to apply the same patent rules which have been applied since this action was filed on March 17, 2003, namely, the patent rules from the Northern District of California.

selling, offering for sale and/or using products embodying the patented invention[s], and/or have been and continue to induce and/or contribute to the infringement" of the '118 and '378 patents. (Document No. 1, pp. 3–4).

Conversely, Bedford alleges in its [First] Amended Answer to Complaint (Document No. 25, filed on July 15, 2003) and Second Amended Answer to Complaint (Document No. 102, filed on March 9, 2005) that as a result of the "prosecution [2] of the applications that resulted in the [P]atents-in-[S]uit, as shown by their prosecution histories, [Plaintiff] is estopped from asserting [that Bedford] directly infringed, contributed to the infringement of, or induced the infringement of any claim of any of the [P]atents-in-[S]uit either directly or under the doctrine of equivalence." *See* Document No. 25, ¶ 21; Document No. 102, ¶ 21; *see also* Document No. 102, ¶ 53. In particular, Bedford argues in its Third Counterclaim that Plaintiff's Patents-in-Suit are "void and unenforceable due to *inequitable conduct* before the U.S. Patent and Trademark Office." (Document No. 102, ¶ 53). (emphasis added). Bedford asserts that material information was known to the patentees (or their representatives) "regarding substantial research and other prior art concerning polymeric deck structures, and that this information was kept secret from the examiner ...." (Document No. 102, ¶ 33).

The Plaintiff has responded to Bedford's [First] Amended Answer to Complaint (Document No. 25) in Plaintiff's Answer to Amended Counterclaim (Document No. 28, filed on July 29, 2005), and in Plaintiff's Reply to the Second Amended Counterclaims of Defendant Bedford Reinforced Plastics, Inc. (Document No. 105). Plaintiff's answer to Bedford's charges of "inequitable conduct" states that "the prosecution history of the patents speaks for [sic] themselves" and the assertions made by Bedford "are denied". (Document No. 28, ¶¶ 49–51). Moreover, the Plaintiff objected to the production of "information subject to the attorney-client privilege, work-product immunity and/or other privileges or immunities, including work performed by attorneys." *Id.* at ¶ 53.

In order to address Plaintiff's claims of patent infringement, the Court Order, dated October 27, 2003, appointed a special master in the case *sub judice*.[3] (Document No. 53).

2. In order to clarify the term "prosecution" as understood in the context of the above-captioned civil action, the Court sets forth the following background as provided in the record in the case *sub judice*. Specifically, when a patent applicant applies to the U.S. Patent and Trademark Office for a patent, the applicant provides an application which includes a "detailed description of the various embodiments of the invention, and one or more numbered paragraphs known as claims. Each claim defines in words what the applicant believes to be an invention. Filing the application [initiates] a back-and-forth dialogue (referred to as "prosecution") between the applicant and an examiner at the U.S. Patent and Trademark Office regarding whether the applicant's claims actually define something new, or if those claims merely define ... what was already known or obvious to those of ordinary skill." (Document No. 33, p. 2). Furthermore, at "any time during the prosecution, the applicant may file another copy of the application, but with different claims. The new application is considered related to the original application, and receives the benefit of priority awarded to the original application. In this manner, a single original application may spawn any number of related, 'continuation' patents." *See e.g., University of West Virginia Board of Trustees v. VanVoorhies*, 278 F.3d 1288, 1297 (Fed.Cir.2002) ("Because the '970 assignment expressly required

VanVoorhies to assign all [continuation-in-part] applications of the '970 application to WVU, we affirm the [district] court's conclusion that VanVoorhies was required to assign the '340 [continuation-in-part] application to WVU, and that he breached his duty by refusing to do so."); *also see e.g.,* Manual of Patent Examining Procedure § 201.08 (7th ed. Rev. 1 Feb. 2000)("MPEP")("A continuation-in-part is an application filed during the lifetime of an earlier nonprovisional application ..., repeating some substantial portion or all of the earlier nonprovisional application and adding matter not disclosed in the said earlier nonprovisional application.")(cited in *VanVoorhies*, 278 F.3d at 1297). This process may continue for many years, such that an applicant can claim an "invention" many years after the original priority date of the application. *Id.*

3. Generally, the Court observes that there are two basic stages in the litigation of a patent infringement claim. *See S.S. White Burs, Inc., and Temple University v. Neo–Flo, Inc., d/b/a Microcopy*, 2003 WL 21250553, *1 (E.D.Pa.2003). The first stage "is the process known as 'claim construction', [where] the court determines the scope and meaning of the patent claims disputed by the parties." *Id. (citing Illinois Tool Works, Inc. ex rel Simco Div. v. Ion Systems. Inc.*, 250 F.Supp.2d 477 (E.D.Pa.2003)). The claim con-

The special master was directed to prepare a report and recommendation to this Court on the issue of claim construction. *Id.* Thereafter, all parties to the above-captioned action provided briefs and submissions to the special master addressing their proposed forms of claim construction. (Document No. 94).

On June 18, 2004, Bedford filed a Motion to Compel 1) The Production of Documents Based on Waiver of Privilege and 2) The Continued Deposition Once the Underlying Documents are Produced. (Document No. 88–1).[4] In its motion, Bedford argued that the Plaintiff waived attorney-client privilege during the deposition testimony of one of Plaintiff's representatives. Thereafter, on July 6, 2004, the Plaintiff filed a Reply to Bedford's Motion to Compel claiming that no such waiver occurred. (Document No. 91).

On January 10, 2005, the special master prepared a draft report and recommendation and served that draft upon the parties for their comments.[5] (Document No. 94). Consequently, the parties have responded to the special master's draft report and recommendation. *See* Document Nos. 96, 97 & 98.

On February 28, 2005, the Court held a status conference wherein the parties addressed several issues. One of the disputed issues presented to the Court was whether Plaintiff should be compelled to produce doc-uments based upon an alleged waiver of attorney-client privilege occurring in the Rule 30(b)(6) deposition of Ms. Albright, representative for Plaintiff, who testified to the factual matters underlying the Plaintiff's decisions regarding the prosecution of the Patents–in–Suit. *See* Document No. 91. Accordingly, the Court addresses Bedford's Motion to Compel and the Plaintiff's reply thereto.

## DISCUSSION

In Bedford's motion to compel the "production of documents", Bedford argues that the issue of waiver of attorney-client privilege "implicates a substantive question of patent law," which results in Federal Circuit law being applicable to the resolution of this issue. (Document No. 88, p. 3). Bedford also asserts that the Plaintiff has waived the attorney-client privilege in the following two ways: first, the Plaintiff has waived the attorney-client privilege "in order to defeat the intent prong of the inequitable conduct allegation"; and second, the Plaintiff has waived the attorney-client privilege through deposition testimony.

### A. Inequitable Conduct

 The Court observes that "[i]nequitable conduct arises when material art is not disclosed to the Patent Office and the motiva-

---

struction phase generally follows a *"Markman hearing"* (named after *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)) "at which the parties present arguments as to why the court should construe a claim a certain way." *S.S. White Burs*, 2003 WL 21250553, at *1 (citing Illinois Tool Works, Inc., supra)*. The second stage in the litigation "occurs at trial, when the factfinder compares the judicially-defined claims with the device that allegedly infringes upon them." *Id.*

In the case *sub judice*, the parties to the above-captioned patent litigation have agreed to the appointment of a special master. Accordingly, the special master prepares a report and recommendation for review by the parties and by the Court. The report and recommendation details the findings of fact and legal conclusions drawn by the special master regarding disputed issues of claim construction.

It is noted that the appointment of the special master was done by Judge Cindrich prior to this case being assigned to the author of this opinion, Judge Gibson.

4. The Court observes that on June 21, 2004, Bedford also filed a Motion to Seal Bedford's Motion to Compel at Document No. 88–1. (Document No. 89–1). By this Court's Order, dated June 29, 2004, Bedford's Motion to Seal at Document No. 89–1 was granted.

5. The Court observes that the special master's draft report and recommendation was filed with the Court under seal. (Document No. 94). However, during the status conference on February 28, 2005, all parties in the case *sub judice* indicated to the Court that the special master's report and recommendation, both draft and final form, need not be filed under seal. (Document No. 99).

The Court also notes that in order to resolve the issues presented in Bedford's Motion to Compel at Document No. 88–1, the Court shall incorporate the description of the Patents–in–Suit as set forth in the special master's draft report and recommendation at Document No. 94. However, the Court's reference to the prosecution histories as provided by the special master should not be interpreted as this Court's adoption of either parties' proposed claim constructions or as this Court's adoption of the special master's draft report and recommendation.

tion for not disclosing the material prior art is an intent to deceive the United States Patent and Trademark Office during the course of its examination of the pending application." *Ziggity Systems, Inc. v. Val Watering Systems,* 769 F.Supp. 752, 812 (E.D.Pa.1990)(*citing Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 872 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989)). "[I]n order to establish the defense of inequitable conduct, defendants must establish by clear and convincing evidence (1) that the information not disclosed to the Patent Office was material, and (2) that by not disclosing that material information, plaintiff intended to deceive the Patent Office." *Id.* at 812; *see also GFI, Inc. v. Franklin Corp.,* 265 F.3d 1268, 1273, 60 USPQ2d 1141 (Fed.Cir.2001); *Baxter Int'l, Inc. v. McGaw, Inc.,* 149 F.3d 1321, 1327, 47 USPQ2d 1225, 1228–29 (Fed. Cir.1998). The elements of materiality and intent "are questions of fact reviewed for clear error." *GFI, Inc.,* 265 F.3d at 1273 (*citing Baxter Int'l, Inc.,* 149 F.3d at 1327). The elements of materiality and intent are also reviewed in terms of how they relate comparatively to each other, in that, "[t]he more material the omission, the less culpable the intent required, and vice versa." *GFI, Inc.,* 265 F.3d at 1273 (*quoting Halliburton Co. v. Schlumberger Tech. Corp.,* 925 F.2d 1435, 1439, 17 U.S.P.Q.2d 1834, 1838 (Fed. Cir.1991)). With regard to the element of intent, in *Kingsdown,* the Federal Circuit Court of Appeals determined that "a finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown,* 863 F.2d at 876 (quoted in *Ziggity Systems, Inc.,* 769 F.Supp. at 812).

Bedford asserts that in addition to waiving the attorney-client privilege by attempting to defeat the intent prong of an allegation of inequitable conduct, Plaintiff also waived the attorney-client privilege during the deposition testimony of Ms. Albright, Plaintiff's counsel. (Document No. 88, p. 14). Specifically, Bedford claims that Ms. Albright openly revealed 1) her thought process in not disclosing the withheld prior art, 2) her discussions with the client's inventors, 3) her discussions with outside counsel involving legal advice concerning disclosing the withheld prior art, 4) her advice and communications with her client's management concerning the decision not to disclose the withheld prior art, and 5) her legal conclusions "that [the Plaintiff] had fulfilled its duty of candor." (Document No. 88, pp. 2–3).

Based upon these asserted waivers, Bedford requests that Plaintiff be required to produce all the communications between Ms. Albright, the inventors, outside counsel for [the Plaintiff], and her management including Grant Godwin [6] regarding the prosecution of the Patents–in–Suit, the "prior art in [the Plaintiff's] knowledge or possession during the prosecution of the patents-in-suit, or the decision to withhold certain pieces of prior art from the United States Patent and Trademark Office during prosecution of the patents-in-suit." [7] (Document No. 88, Exhibit A).

Conversely, Plaintiff argues that regional circuit law applies to the issue of whether the Plaintiff waived the attorney-client privilege "because waiver by the disclosure of privileged material does not" relate to patent law specifically. (Document No. 91 pp. 3–4) *quoting GFI, Inc. Franklin Corp.,* 265 F.3d at 1272 (Fed.Cir.2001). Furthermore, Plaintiff asserts that it has "not placed its attorneys' advice in issue in this litigation", nor has Plaintiff waived the attorney-client privilege when Ms. Albright testified as to "factual matters—which do not constitute privileged communications". (Document No. 91, pp. 1, 4). Specifically, Plaintiff argues that Ms. Albright testified only as to *underlying facts* upon which the communications with

---

**6.** Mr. Godwin is a member of Plaintiff's management. (Document No. 88, p. 11).

**7.** The Court observes that Bedford has failed to distinguish between a waiver of attorney-client privilege regarding communications involving

prior art and a waiver of the work-product immunity doctrine regarding documents related to the issue of material prior art. Consequently, the Court addresses, *supra,* the distinction between this privilege and this immunity and the scope of waiver as it applies to the case *sub judice.*

Plaintiff's attorneys were based, and Plaintiff argues that she did not disclose the *content* of a communication "to an attorney for the purpose of obtaining legal advice or services." *Id.* at 5 (*quoting In re Spalding,* 203 F.3d at 805). (emphasis added).

Based upon analysis of Bedford's motion and Plaintiff's reply, the Court determines that the resolution of Bedford's motion involves several issues: (1) whether to apply Federal Circuit law or our regional circuit law, i.e., the Third Circuit, to the issue of attorney-client privilege in the case *sub judice;* (2) whether the communications and documents sought by Bedford are protected by the attorney-client privilege and the work-product doctrine; (3) whether Plaintiff engaged in inequitable conduct and whether such inequitable conduct is sufficient to abrogate the attorney-client privilege; and (4) whether the scope of Plaintiff's alleged waiver abrogates the work-product doctrine.

## B. Attorney–Client Privilege: Federal Circuit Law or Regional Circuit Law

Federal Rule of Civil Procedure 26(b)(1) provides:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed.R.Civ.P. 26(b)(1). Thus, Rule 26 provides that relevant but privileged matters are not discoverable.

■ The attorney-client privilege "is the oldest of the privileges for confidential communications known to the common law." *Upjohn Company v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981)(citing 8 J. Wigmore, Evidence § 2290 (McNaughton rev.1961)). The purpose of the attorney-client privilege is "to foster disclo-sure and communication between the attorney and the client." *In re Grand Jury Investigation,* 599 F.2d 1224, 1235 (3d Cir.1979)(quoted in *United States v. Fisher,* 692 F.Supp. 488, 490 (E.D.Pa.1988)). Accordingly, such "full and frank communication between attorneys and their clients ... promote[s] broader public interests in the observance of law and administration of justice." *Upjohn Co.,* 449 U.S. at 389, 101 S.Ct. 677. Also, the "privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Id.*

■ However, the attorney-client privilege cannot "stand in derogation of the search for truth and must therefore be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *In re Grand Jury Investigation,* 599 F.2d at 1235 (quoted in *United States v. Fisher,* 692 F.Supp. at 490). Thus, a party claiming that the attorney-client privilege exists bears the burden of proving that the privilege applies to the communication. *United States v. Fisher,* 692 F.Supp. at 490–91; *see also In the Matter of Bevill, Bresler & Schulman Asset Management Corp.,* 805 F.2d 120, 126 (3d Cir.1986); *Colorado v. Schmidt–Tiago Constr. Co.,* 108 F.R.D. 731, 734 (D.Colo.1985). Moreover, "whether the privilege applies is a question of law for the court to decide." *Andritz Sprout–Bauer, Inc. v. Beazer East, Inc.,* 174 F.R.D. 609, 632 (M.D.Pa.1997).

■ The Court observes that the attorney-client privilege applies when the following elements are proven:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of

committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client. *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950)(quoted in *United States v. Fisher,* 692 F.Supp. at 491). Once a party demonstrates the existence of an attorney-client privilege regarding specific communications, then the party challenging the privileged communication bears the burden of demonstrating that a waiver of the attorney-client privileged communication has occurred.

■ According to BLACK'S LAW DICTIONARY, a waiver is "the voluntary, intentional relinquishment of a known right." BLACK'S LAW DICTIONARY 1417 (Special Deluxe 5th ed.1979)(quoted in *Novartis Pharmaceuticals Corp. v. EON Labs Mfg., Inc.,* 206 F.R.D. 396, 398 (D.Del.2002)). In other words, any "voluntary disclosure by the holder of the privilege is inconsistent with the confidential nature of the relationship, and thereby waives the privilege." *United States v. Fisher,* 692 F.Supp. at 494 (*citing In re Subpoenas Duces Tecum,* 738 F.2d 1367, 1369 (D.C.Cir.1984)).

■ Generally, "the attorney-client privilege belongs to the client." *United States v. Fisher,* 692 F.Supp. at 494 (citing to 1 G. Weissenberger, Federal Evidence § 501.5 (1987)). While an attorney may assert the privilege on the client's behalf, *Schwimmer v. United States,* 232 F.2d 855, 863 (8th Cir.1956), *cert. denied,* 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956), only the client may waive the privilege. 8 Wigmore § 2327 at 635 (cited in *United States v. Fisher,* 692 F.Supp. at 494). Thus, in determining the waiver of attorney-client privileged communications, "it is the intent of the client that controls" the Court's analysis. *United States v. Fisher,* 692 F.Supp. at 494. For example, a "[w]aiver of the attorney-client privilege will be implied when a client has testified concerning portions of an attorney-client communication." *United States v. Fisher,* 692 F.Supp. at 494 (*citing Hollins,* 773 F.2d at 196; *Sedco International, S.A. v. Cory,* 683 F.2d 1201, 1206 (8th Cir.1982), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982)). Additionally, a party "can waive the attorney client privilege by asserting claims or defenses that put his or her attorney's advice in issue in the litigation." *Rhone–Poulenc Rorer Inc. v. Home Indem. Co.,* 32 F.3d 851, 863 (3d Cir.1994).

■ In a patent suit, where a party is alleged to have acted willfully and infringed upon a patent, or where a party is alleged to have intended to deceive the U.S. Patent and Trademark Office through inequitable conduct, and "that party asserts as [an] essential element of its defense that it relied upon the advice of counsel, the party waived the privilege regarding communications pertaining to that advice." *Rhone–Poulenc Rorer Inc.,* 32 F.3d at 863 (citing to *Mellon v. Beecham Group PLC,* 17 USPQ2d 1149, 1151, 1991 WL 16494 (D.N.J.1990)). In other words, by making the decision to take an affirmative step to place the advice of counsel in issue in the litigation, "the client has opened to examination facts relating to that advice." *Rhone–Poulenc Rorer Inc.,* 32 F.3d at 863. Accordingly, the client "may waive the privilege either expressly, or implicitly by conduct that extinguishes one of the necessary elements of the privilege." *United States v. Fisher,* 692 F.Supp. at 494 (*citing Hollins v. Powell,* 773 F.2d 191, 196 (8th Cir.1985), *cert. denied,* 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986)).

■ Generally, in a federal question case, the federal law of privileges governs the entire case. *Andritz Sprout–Bauer, Inc.,* 174 F.R.D. 609, 632; *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.,* 671 F.2d 100, 104 (3d Cir.1982). Pursuant to the federal law of privileges, Federal Rule of Evidence 501 provides:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or

political subdivision thereof shall be determined in accordance with State law.

Fed.R.Evid. 501; *Andritz Sprout–Bauer, Inc.,* 174 F.R.D. 609, 632. Accordingly, "[i]n deriving the principles of federal common law which apply under Rule 501, the federal courts typically look to the state privilege law and follow its lead unless there is a strong federal policy to the contrary." *Andritz Sprout–Bauer, Inc.,* 174 F.R.D. 609, 632 (*citing* Mia Anna Mazza, *The New Evidentiary Privilege for Environmental Audit Reports: Making the Worst of a Bad Situation,* 23 Ecology L.Q. 79, 98 (1996)); *cf. Rhone–Poulenc Rorer Inc. v. Home Indem. Co.,* 32 F.3d 851, 861 (3d Cir.1994)("As the claims and defenses in issue in [this insurance coverage case] arise under state law, Federal Rules of Evidence 501 and 110(c) provide that we should apply state law in determining the extent and scope of the attorney client privilege.")

Pursuant to federal patent law claims, there is significant dispute among federal courts regarding whether the waiver of attorney-client privilege and the scope of that waiver is governed by Federal Circuit law or regional circuit case law. For example, in *Chimie v. PPG Industries, Inc.,* 218 F.R.D. 416, 419 n. 4 (D.Del.2003) the district court determined that "[t]he better reasoned approach recognizes that questions of waiver are not unique to patent law and are a matter of either state law, as to claims and defenses that arise under state law, or precedent from regional circuits." (*Citing Aspex Eyewear, Inc. v. E'Lite Optik, Inc.,* 276 F.Supp.2d 1084, 1092–93 (D.Nev.2003)) (regional circuit law controls). Also, the Federal Circuit Court in *GFI, Inc. v. Franklin Corp.,* 265 F.3d 1268, 1272 (Fed.Cir.2001) concluded the following:

> We apply regional circuit law to procedural questions that are not themselves substantive patent law issues so long as they do not (1) pertain to patent law, *Flex–Foot, Inc. v. CRP, Inc.,* 238 F.3d 1362, 1365, 57 USPQ2d 1635, 1637 (Fed.Cir.2001) ("[W]e will apply our own law to both substantive and procedural issues 'intimately involved in the substance of enforcement of the patent right' ") (citation omitted), (2) bear an essential relationship to matters committed to our exclusive control by statute,

> or (3) clearly implicate the jurisprudential responsibilities of this court in a field within its exclusive jurisdiction, *Midwest Indus., Inc. v. Karavan Trailers, Inc.,* 175 F.3d 1356, 1359, 50 USPQ2d 1672, 1675 (Fed.Cir.1999)(en banc in relevant part). Because waiver by the disclosure of privileged material does not meet any of these criteria, we apply the law of the Fifth Circuit to our review of the district court's judgment. (citation omitted).

*GFI, Inc.,* 265 F.3d at 1272.

The Court also observes that courts have agreed that "discovery disputes and other procedural issues *unique to patent cases* should be decided pursuant to the law of the Federal Circuit, as opposed to the regional circuit", *Simmons, Inc. v. Bombardier, Inc.,* 221 F.R.D. 4, 9 n. 5 (D.D.C.2004) (*citing Panduit Corp. v. All States Plastic Mfg. Co.* 744 F.2d 1564, 1574–75 (Fed.Cir.1984) *overruled on other grounds by Richardson–Merrell, Inc., v. Koller,* 472 U.S. 424, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985)) (emphasis added). The Federal Circuit Court in *In re Spalding Sports Worldwide Inc.,* 203 F.3d 800, 803–04 (Fed.Cir.2000) determined that whether Spalding's invention record was protected by the attorney-client privilege was "unique to patent law because the invention record relates to an invention submitted for consideration for possible patent protection ... clearly implicat[ing] substantive patent law." *In re Spalding,* 203 F.3d at 804. Accordingly, the Federal Circuit Court in *In re Spalding* concluded that Federal Circuit law applied to the issue of whether the attorney-client privilege applies to an invention record prepared and submitted to house counsel relating to a litigated patent claim. *Id.* at 803.

▮ Based upon consideration of the positions of the parties, the above-cited relevant case law, and the facts of the case *sub judice,* the Court determines that Bedford's allegation of inequitable conduct and the possible waiver of Plaintiff's attorney-client privilege thereto implicates a substantive patent law issue. Specifically, Bedford claims that the Patents–in–Suit are unenforceable based upon the Plaintiff's failure to disclose material prior art to the United States Patent and

Trademark Office. Clearly, the question of possible patent protection and whether a patent is enforceable implicates the jurisprudential responsibilities of the Federal Circuit Court. Accordingly, the Court determines, based upon the patent law issues raised by the parties in the case *sub judice*, that Federal Circuit law applies to Plaintiff's alleged waiver of attorney-client privilege and work-product doctrine.

## C. Attorney–Client Privilege: Communications Protected

Bedford alleges that various communications are at issue and that the attorney-client privilege regarding these communications has been waived. Generally, Bedford claims that Ms. Albright's deposition testimony waived any privilege regarding the following: (1) the substance of legal advice from outside counsel, Mr. Cage; (2) the content of Ms. Albright and Mr. Cage's communications with one of the inventors, Mr. Underwood; and (3) the Plaintiff's attorneys and inventors' detailed knowledge of prior art that was not disclosed to the United States Patent and Trademark Office. (Document No. 88). Conversely, Plaintiff argues that the testimony of Ms. Albright did not reveal any communication that is protected by attorney-client privilege, nor did her testimony place in issue privileged communications. (Document No. 91).

 Initially, the Court observes that in determining whether the attorney-client privilege applies to particular communications, the threshold inquiry is "whether the communication is one that was made by a client to an attorney for the purpose of obtaining legal advice or services." *In re Spalding*, 203 F.3d at 805 (*citing Genentech, Inc. v. United States Int'l Trade Comm'n*, 122 F.3d 1409, 1415, 43 USPDQ2d 1722, 1727 (Fed.Cir.1997)) (*citing American Standard, Inc. v. Pfizer Inc.*, 828 F.2d 734, 745, 3 USPDQ2d 1817, 1824 (Fed.Cir.1987)). In other words, there must be the existence of an attorney-client relationship. However, the Court notes that the existence of an attorney-client relationship does not necessarily depend upon the payment of fees or upon the execution of a formal contract. *Westinghouse Electric Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311 (7th Cir.1978), cert.

denied, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978) (cited in *United States v. Fisher*, 692 F.Supp. at 491). Rather, the existence of the privilege depends upon the attempt by a party to secure some legal advice or to procure some legal services.

 The Court also observes that the "privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney:

> [T]he protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney."

*Upjohn Co.*, 449 U.S. at 395–396, 101 S.Ct. 677 (*quoting Philadelphia v. Westinghouse Electric Corp.*, 205 F.Supp. 830, 831 (D.C.Pa. 1962)). Consequently, the nature of the communications at issue must warrant the protection of the privilege before this issue of whether there was a waiver of such privilege even arises. Accordingly, the Court addresses Bedford's allegation that Ms. Albright waived privileged communications during her deposition testimony.

### 1. Advice from Mr. Cage

In Ms. Albright's response to questions directed by opposing counsel regarding a telephone call that she had with Mr. Cage, Plaintiff's counsel in 1997, Bedford alleges that Ms. Albright put in issue Mr. Cage's advice "regarding the rationale for not disclosing the various pieces of critical prior art:"

> Q: So you are basing your testimony today on your recollection of a phone call with Mr. Cage in 1997, where Mr. Cage advised you that you did not have to disclose the Hardcore all polymeric bridge deck because you had disclosed the patent of Brogan concerning an airplane wing, correct?

A: I'm—I remember a conversation with Mr. Cage relating what Phil Underwood knew of a Hardcore project, and what was described in the Brogan patent. And there was no new duty to make disclosures in the '37 patent—'378 patent as a result of it.

Q: And you're remembering this conversation from 1997?

A: Yes.

Q: And you remember specifically the Brogan patent from 1997 is the rationale for not disclosing the all polymeric bridge deck of Hardcore Engineering?

A: Yes.

 \* \* \* \* \* \*

Q: When you say he [Mr. Godwin] would have been aware of the decision not to disclose the Hardcore triangular cross-section fiber reinforced polymer bridge deck to the United States Patent and Trademark Office, does that mean that he [Mr. Godwin], in fact, made the decision [not to disclose the prior art]?

A: I think I can clarify this. I communicated, along with outside counsel, a recommendation to Mr. Godwin as to what action to take, upon discovering information from Phil Underwood about a Hardcore bridge project. Mr. Godwin would have heard that recommendation that no new disclosure was necessary, and he would have consented and said, fine. I—yes. So if that's your question, that's—that's what I remember happening. That's my answer.

(Document No. 88, pp. 11–12; Albright Deposition, Exhibit C, pp. 83–84, 158–159).

## 2. Communication with Mr. Underwood

Bedford also alleges that Ms. Albright continued to waive any privileged communications when she testified to the content of communications with Mr. Underwood regarding the Hardcore bridge project:

Q: In the Hardcore product, you're certain in your testimony here today that that was not a unitary piece?

Q: But, in fact, was a sandwich panel, correct?

A: Right. I was remembering back to what Phil Underwood told us about the project, and I'm remembering that it was face sheets glued with a core, and it was not manufactured as one piece.

Q: So Phil Underwood told you it was a sandwich panel with a top sheet, a bottom sheet, and a core in between?

A: That's what I remember. I—

(Document No. 88, p. 12; Albright Deposition, Exhibit C, pp. 172–173) (objections omitted). Bedford alleges that Ms. Albright's communications with Mr. Underwood about the Hardcore polymeric bridge deck aided in Plaintiff's final decision regarding their duty to disclose this prior art to the United States Patent and Trademark Office.

## 3. Communication Regarding Prior Art

Furthermore, Bedford argues that through her deposition testimony, Ms. Albright waived any privileged communication when she conveyed the substance of the advice received from Mr. Cage and Mr. Underwood regarding the disclosure of prior art during the application process with the United States Patent and Trademark Office:

Q: And it's also a fact that [the Plaintiff] made an intentional decision not to disclose the Hardcore bridge deck to the United States Patent and Trademark Office, correct?

A: In 1997, which is when I remember [the Plaintiff] becoming aware, in general, of a Hardcore bridge project, we did not see any additional duty to make a disclosure to the patent office, based on that, based on that knowledge of the Hardcore project.

Q: And that was an intentional decision by the corporation, after consulting with outside counsel, correct?

A: We consulted with outside counsel and made a decision that no new duty to disclose had arisen.

Q: And that was based on the fact that you had disclosed the Brogan patent, which was for an airplane wing, correct?

A: I can answer that it was based on the fact that the Brogan patent was disclosed to the patent office, and we can look at the Brogan patent. If I can refresh my memory, [I] can tell you what I know about what's described in the Brogan patent.

Q: How do you know it was based on the fact that the Brogan patent was disclosed to the U.S. Patent and Trademark Office?

A: The advice of counsel, and input from Phil Underwood as to a review of what was described in the Brogan patent, and what he knew about the Hardcore project.

Q: When was that advice of counsel that the Brogan patent fulfilled all of your duty to disclose the Hardcore composite bridge deck received?

A: 1997. His—is the date that I remember, as I sit here today, after reviewing my files.

Q: And who provided that advice?

A: Attorneys at McDermott, Will & Emery who represented us in the prosecution of these patents.

Q: Which attorney specifically provided that advice in 1997?

A: Ken Cage.

Q: Was that advice contained in a written memorandum?

A: Not that I'm aware of today, no.

Q: So you are remembering five years ago what advice was provided by Ken Cage, concerning the Hardcore all polymeric bridge deck, correct?

A: Yes, after review of my files, I am aware that Mr. Cage reviewed the issue, reviewed what Mr. Underwood had commented on with respect to the prior art search, and advised us on this matter.

Q: Did you take notes in 1997 that revealed the advice you received?

A: I don't remember.

Q: Well, what about reviewing your file made you recall that you received advice from Mr. Cage that you did not have to disclose the Hardcore all polymeric bridge deck?

A: I reviewed the communication from Mr. Underwood, and it refreshed my memory as to what I would have discussed with counsel at that time.

Q: How did it refresh your memory?

A: The—the communication talked about the issues, and in thinking about those issues, remembered conversations with counsel on those issues.

(Document No. 88, pp. 9–10; Albright Deposition, Exhibit C, pp. 68–72)(objections omitted).

■ Based upon the above testimony and the record in the case *sub judice*, the Court determines that any communications between Plaintiffs' attorneys, Ms. Albright, and outside counsel, Mr. Cage, regarding prior art and the duty to disclose the prior art to the United States Patent and Trademark Office constitutes privileged communications. Indeed, while the underlying facts supporting the Plaintiff's decision not to disclose prior art during the application process is not protected under the attorney-client privilege, the substantive nature of the communications regarding whether the Plaintiff was legally bound to disclose the prior art is privileged communication. For example, Plaintiff's representative, Ms. Albright, and Plaintiff's attorneys consulted with outside counsel, Mr. Cage, in an attempt to secure legal opinions or assistance in the prosecution of the Patents–in–Suit. The nature of these communications was to evaluate patentability and/or to prepare a patent application. In order to attempt to succeed in the prosecution of the Patents–in–Suit, the Plaintiff sought detailed knowledge regarding prior art and relevant technical information from Mr. Underwood. Accordingly, since the nature of Plaintiff's communications with Plaintiff's attorneys, Ms. Albright, and outside counsel, Mr. Cage, was based upon the application and prosecution of the Patents–in–Suit, the Court concludes that these communications are privileged with regard to information regarding prior art.

With regard to communications to the inventor, Mr. Underwood, the Court finds that the underlying purpose of the attorney-client privilege is not applicable. Specifically, the attorney-client privilege is meant to foster disclosure between an attorney and his/her

client; however, Mr. Underwood is clearly neither an attorney nor a client. Accordingly, the privilege does not apply to those communications between Plaintiff and Mr. Underwood regarding prior art.

## D. Attorney–Client Privilege: Communications Waived

Having determined that the communications between/among Plaintiff, Plaintiff's attorneys, Ms. Albright, and Mr. Cage regarding prior art are privileged communications, the Court next determines whether that privilege has been abrogated by Bedford's assertion of inequitable conduct. Specifically, Bedford argues that during Ms. Albright's testimony she placed in issue the Plaintiff's reliance on advice of counsel regarding the disclosure of prior art to the United States Patent and Trademark Office and that the failure to disclose this prior art constituted inequitable conduct.

Initially, the Court observes that the Federal Circuit in *In re Spalding* determined that in order to invoke the crime-fraud exception and pierce the attorney-client privilege, "a party challenging the attorney-client privilege must make a prima facie showing that the communication was made 'in furtherance of' a crime or fraud." *In re Spalding,* 203 F.3d at 807. However, an allegation of the crime-fraud exception is distinguishable from an allegation of inequitable conduct. Specifically, the Federal Circuit court explained that "inequitable conduct is a broader, more inclusive concept than the common law fraud needed to support a *Walker Process* [8] counterclaim .... Inequitable conduct

8. In *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 46 USPQ2d 1097 (Fed.Cir. 1998), the Federal Circuit addressed a patent infringement claim of a dental implant patent. One of the issues involved was whether antitrust liability may be based upon either fraud or a claim that the patentee's suit is a "sham". Although the antitrust analysis is not relevant to the issues in this case, the following analysis includes a distinction between fraud and inequitable conduct as applied to patent infringement claims:

> A patentee who brings an infringement suit may be subject to antitrust liability for the anticompetitive effects of that suit if the alleged infringer (the antitrust plaintiff) proves (1) that the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 177, 86 S.Ct. at 350[, 15 L.Ed.2d 247,] 147 USPQ 404, 407 (1965), or (2) that the infringement suit was 'a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor,' *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961).
>
> \* \* \* \* \* \*
>
> In *Walker Process,* the Supreme Court held that in order 'to strip [a patentee] of its exemption from the antitrust laws' because of its attempting to enforce its patent monopoly, an antitrust plaintiff is first required to prove that the patentee 'obtained the patent by knowingly and willfully misrepresenting facts to the [PTO]'. 382 U.S. at 177, 86 S.Ct. at 350[, 15 L.Ed.2d 247,] 147 USPQ at 407. The plaintiff in the patent infringement suit must also have been aware of the fraud when bringing suit. *Id.* at 177 & n. 6, [382 U.S. 172,] 86 S.Ct. at 350 & n. 6[, 15 L.Ed.2d 247,] 147 USPQ at 407 & n. 6.

Justice Harlan, in a concurring opinion, emphasized that to 'achiev[e] a suitable accommodation in this area between the differing policies of the patent and antitrust laws,' a distinction must be maintained between patents procured by 'deliberate fraud' and those rendered invalid or unenforceable for other reasons. *Walker Process,* 382 U.S. at 179–80, 86 S.Ct. at 351–52, 15 L.Ed.2d 247, 147 USPQ at 408.

\* \* \* \* \* \*

Consistent with the Supreme Court's analysis in *Walker Process,* as well as Justice Harlan's concurring opinion, we have distinguished 'inequitable conduct' from *Walker Process* fraud, noting that inequitable conduct is a broader, more inclusive concept than the common law fraud needed to support a *Walker Process* counterclaim.

\* \* \* \* \* \*

Inequitable conduct in fact is a lesser offense than common law fraud, and includes types of conduct less serious than 'knowing and willful' fraud. In *Norton v. Curtiss,* 57 C.C.P.A. 1384, 433 F.2d 779, 792–94 & n. 12, 167 USPQ 532, 543–45 & n. 12 (1970), our predecessor court explicitly distinguished inequitable conduct from 'fraud,' as that term was used by the Supreme Court in *Walker Process.* The court [in *Norton*] noted that

> the concept of "fraud" has most often been used by the courts, in general, to refer to a type of conduct so reprehensible that it could alone form the basis of an actionable wrong (e.g., the common law action for deceit.).... Because severe penalties are usually meted out to the party found guilty of such conduct, technical fraud is generally held not to exist unless the following indispensable elements are found to be present: (1) a representation of a material fact, (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so

in fact is a lesser offense than common law fraud, and includes types of conduct less serious than 'knowing and willful' fraud." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1069–70, 46 USPQ2d 1097, 1106 (Fed.Cir.1998)(quoted in *In re Spalding*, 203 F.3d at 807). However, the court in *In re Spalding* did not overtly state whether inequitable conduct is sufficient to abrogate the attorney-client privilege [9], rather, the court determined that inequitable conduct required a showing of conduct "less serious than 'knowing and willful' fraud." *In re Spalding*, 203 F.3d at 807 (*quoting Nobelpharma AB*, 141 F.3d at 1069). Under the circumstances of this case, this Court need not address the issue of whether inequitable conduct abrogates the attorney-client privilege, rather, the Court will decide the issue of waiver of the attorney-client privilege based upon its determination of whether Plaintiff has placed in issue a reliance on the advice of counsel in defending an allegation of inequitable conduct.

■ In the case *sub judice*, the Court determines that absent an articulated reliance on counsel advice in order to defend an allegation of inequitable conduct, there is no waiver of attorney-client privilege. Otherwise, a party summoned to court to defend a patent claim conceivably could abrogate the attorney-client privilege of the opposing party by merely asserting the defense of inequitable conduct. Accordingly, in order for

waiver of the attorney-client privilege to occur, the Plaintiff must defend against Bedford's counterclaim of inequitable conduct by asserting that reliance on counsel's advice was a basis for Plaintiff not submitting prior art during application of the Patents–in–Suit.

Reviewing the record in the case *sub judice*, the Court observes that in its replies to Bedford's amended counterclaims, the Plaintiff did not assert that its decision to withhold prior art from the United States Patent and Trademark Office was based upon advice of counsel. *See* Document Nos. 28 & 105. Additionally, in the Plaintiff's Reply to Bedford's Motion to Compel (Document No. 91), the Plaintiff repeatedly asserts that any factual matters to which Ms. Albright testified were not attorney-client privileged communications, and Ms. Albright did not place Plaintiff's attorneys' advice in issue in the case *sub judice*. *Id.* However, reviewing the language of Ms. Albright's deposition testimony, the Court is convinced that Ms. Albright implicated a defense of reliance on counsel advice when she stated the following: 1) based upon a telephone conversation with Mr. Cage, and their discussion of the Hardcore project, there was no new duty to make disclosures (Albright Deposition, Exhibit C, pp. 83–84); 2) she remembered specifically that the review of the Brogan patent from 1997 was the rationale for not disclosing the polymeric bridge deck of Hardcore Engineering (Albright Deposition, Exhibit C, pp. 83–83); and

---

reckless as to the consequences that it is held to be the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived as a result of his reliance on the misrepresentation.

*Id.* at 792–93, 57 C.C.P.A. 1384, 433 F.2d 779, 167 USPQ at 543 [citations omitted].

\* \* \* \* \* \*

The court then contrasted such independently actionable common law fraud with lesser misconduct, including what we now refer to as inequitable conduct, which 'fail[s], for one reason or another, to satisfy all the elements of the technical offense.' *Norton*, 433 F.2d at 793, 167 USPQ at 543. Regarding such misconduct, 'the courts appear to look at the equities of the particular case and determine whether the conduct before them ... was still so reprehensible as to justify the court's refusing to enforce the rights of the party guilty of such conduct.' *Id.* Inequitable conduct is thus an

equitable defense in a patent infringement action and serves as a shield, while a more serious finding of fraud potentially exposes a patentee to antitrust liability and thus serves as a sword.

\* \* \* \* \* \*

Antitrust liability can include treble damages. *See* 15 U.S.C. § 15(a) (1994). In contrast, the remedies for inequitable conduct, while serious enough, only include unenforceability of the affected patent or patents and possible attorney fees. *See* 35 U.S.C. §§ 282, 285 (1994). Simply put, *Walker Process* fraud is a more serious offense than inequitable conduct. *Nobelpharma AB*, 141 F.3d 1059, 1068–70. (citations omitted).

9. However, the conclusion of the Court that *Walker Process* fraud was not established, and therefore, the attorney-client privilege was not abrogated, suggests that inequitable conduct is not sufficient to abrogate the attorney-client privilege.

3) she communicated with outside counsel regarding the Hardcore bridge project, consulted with outside counsel regarding knowledge of the Hardcore bridge project, and recommended that no new disclosure was necessary based on those communications (Albright Deposition, Exhibit C, pp. 68–72). Consequently, Ms. Albright's responses invoked the Plaintiff's attorneys' understanding of its applicable duty of disclosure and its legal thought process in deciding not to disclose. Moreover, in defending an allegation of inequitable conduct, the advice of Plaintiff's attorneys may be relevant to the question of whether the Plaintiff acted with the intent to deceive the Patent Office.

Therefore, the Court determines that in the deposition of Plaintiff's representative, Ms. Albright clearly put in issue Plaintiff's attorneys' understanding of its applicable duty of disclosure with regard to material prior art and the role which attorney-client communications and advice of counsel played in the decision not to disclose certain prior art, such that the Plaintiff has waived the attorney-client privilege with regard to such communications about the disclosure of material prior art to the United States Patent and Trademark Office.

## E. Work–Product Doctrine: Scope of Waiver

■■ Next, the Court must determine the scope of the waiver with respect to the work-product doctrine. Generally, whereas the "attorney-client privilege protects the confidentiality of communications between attorney and client made for the purpose of obtaining legal advice", *Genentech, Inc. v. U.S. Intern. Trade Com'n*, 122 F.3d 1409, 1415, 43 U.S.P.Q.2d 1722 (Fed.Cir.1997), the work-product doctrine "protects the attorney's thought processes and legal recommendations." *Zenith Radio Corp. v. United States*, 764 F.2d 1577, 1580, 3 Fed. Cir. (T) 169, 172 (Fed.Cir.1985) (quoted in *Genentech, Inc.*, 122 F.3d at 1415).

The Court observes that various district courts have wrestled with the scope of waiver as it applies to the work-product doctrine. For example, in *Thorn EMI North America, Inc. v. Micron Technology*, 837 F.Supp. 616 (D.Del.1993) the court determined that "[w]hen an alleged infringer decides to respond to a claim of willful infringement by offering evidence that he or she reasonably and in good faith relied on advice of counsel in making, using or selling the allegedly infringing device, then the advice becomes relevant and admissible. Documents and testimony relating to that advice are relevant in that they are probative of the alleged infringer's intent. They are admissible because the alleged infringer has waived the privilege as to the subject matter of the advice." *Thorn EMI*, 837 F.Supp. at 621. However, the district court also determined that the same rationale does not provide an appropriate justification for expanding the waiver to encompass work-product doctrine. *Id.* at 621–622 ("Counsel's mental impressions, conclusions, opinion, or legal theories are not probative of [the client's] . . . state of mind unless they have been communicated to that client.").

Conversely, the district court in *Mosel Vitelic Corp. v. Micron Technology, Inc.*, 162 F.Supp.2d 307 (D.Del.2000) determined that the counsel's work product is relevant to the client's state of mind, and "[i]t would be . . . irrational to assume that there could be no relationship between what counsel really thought was reflected in [their] private papers and what [counsel] in fact communicated to [the] client. In this important sense, evidence about what really was in the lawyer's mind could be quite relevant to what really was in the client's mind." *Mosel Vitelic Corp.*, 162 F.Supp.2d at 312.

Similarly, in *Novartis Pharmaceuticals Corp. v. EON Labs Manufacturing, Inc.*, 206 F.R.D. 396 (D.Del.2002), the district court's analysis focused on the threshold issue of "the infringer's decision to waive the attorney-client privilege." *Id.* at 398. Specifically, the district court observed that the definition of "waiver" as defined by Black's Law Dictionary, was a "voluntary, intentional relinquishment of a known right". *Id.* at 398 (*quoting* Black's Law Dictionary 1417 (5th ed.1979)). Accordingly, the district court held that invoking a reliance on the advice of counsel as a defense constitutes an express waiver of both the attorney-client privilege and the work-product doctrine. *Id.* at 398.

However, in *Chimie v. PPG Industries, Inc.*, 218 F.R.D. 416, 421 (D.Del.2003) the district court declined to follow the holding in *Novartis.* The district court in *Chimie* determined the following:

It does not follow that a waiver of the one necessarily means, or ought to mean, a waiver of the other. That approach 'fail[s] to consider that the protection stemming from the work product doctrine belongs to the professional, rather than the client, and that the efforts to obtain disclosure of opinion work product should be evaluated with particular care.' *Rhone–Poulenc*, 32 F.3d at 866. The attorney-client privilege and the work product doctrine are based on different public policies, protect different though frequently complementary interests, and are subject to different analyses when considering the propriety of a finding of waiver. *Cf. Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 486–87 n. 17, n. 18, n. 19 (3d Cir.1995) (court repeatedly emphasizing that, had argument been made on work product grounds, a different analysis would be required and perhaps a different result obtained than was under attorney-client privilege analysis). Neither legal protection is well served by conflating the analysis of the two.

*Chimie*, 218 F.R.D. at 421.

Reviewing Federal Circuit law, the Court observes that the Federal Circuit Court in *Genentech, Inc.*, 122 F.3d at 1416–17 set forth the following analysis regarding Genetech's assertion that the waiver of privilege should be limited to the district court proceeding:

Once the attorney-client privilege has been waived, the privilege is generally lost for all purposes and in all forums. Professor Rice explains the scope of a waiver of the attorney-client privilege as follows:

When the attorney-client privilege has been waived, whatever the subject matter of the waiver, the privilege is gone. The client, therefore, may no longer use the privilege to prevent access to the communications in question by either the party who successfully challenged the privilege claim or by anyone else in the present or future litigation. Having had the opportunity to assert and address the privilege claim in a judicial proceeding, the privilege holder is thereafter barred, under the doctrine of res judicata and collateral estoppel, from relitigating the resolved claim.

Rice, *Attorney–Client Privilege* § 9:85, at 9–295 (footnotes omitted); *see* 8 John H. Wigmore, *Evidence in Trials at Common Law* § 2328(1), at 639 (1961)("[W]aiver at a first trial should suffice as a waiver for a later trial since there is no longer any reason for preserving secrecy."); *see also* Epstein & Martin, *Attorney–Client Privilege* at 76 ("Once an express or implicit waiver has occurred, the privilege is generally treated as relinquished for all purposes and in all circumstances thereafter.")

*Genentech, Inc.*, 122 F.3d at 1416–1417. The Federal Circuit court ultimately determined that "[t]his court ... has never recognized such a limited waiver." *Id.* at 1417.

Finally, this Court observes that in *Upjohn Co. v. United States*, 449 U.S. at 398–400, 101 S.Ct. at 686–688, the United States Supreme Court demonstrated that a strong public policy exists against the disclosure of an attorney's protected work-product. For example, in determining whether the Government made a sufficient showing of necessity to overcome the protections of the work-product doctrine, the Court addressed the following:

Rule 26 accords special protection to work product revealing the attorney's mental processes. The Rule permits disclosure of documents and tangible things constituting attorney work product upon a showing of substantial need and inability to obtain the equivalent without undue hardship.... Rule 26 goes on, however, to state that '[i]n ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation.'

\* \* \* \* \* \*

... [S]ome courts have concluded that no showing of necessity can overcome protection of work product which is based on oral statements from witnesses. *See, e.g., In re Grand Jury Proceedings*, 473 F.2d 840, 848 (C.A.8 1973) (personal recollections,

notes, and memoranda pertaining to conversation with witnesses); *In re Grand Jury Investigation,* 412 F.Supp. 943, 949 (E.D.Pa.1976) (notes of conversation with witness 'are so much a product of the lawyer's thinking and so little probative of the witness's actual words that they are absolutely protected from disclosure').

\* \* \* \* \* \*

As Rule 26 ... make[s] clear, such work product cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship. While we are not prepared at this juncture to say that such material is always protected by the work-product rule, we think a far stronger showing of necessity and unavailability by other means than was made by the Government ... would be necessary to compel disclosure.

*Upjohn Co.,* 449 U.S. at 400–402, 101 S.Ct. at 688–689.

 Based upon the above relevant case law, and the arguments presented by the parties regarding the waiver of work-product doctrine and the decision by Plaintiff not to disclose material prior art to the United States Patent and Trademark Office, the Court determines that the implicit waiver of the attorney-client privilege by the Plaintiff also results in a waiver of the work-product doctrine. Specifically, the Court determines that those documents requested by Bedford regarding the prosecution of the Patents–in–Suit and the decision to withhold material prior art shall be produced by the Plaintiff.

An appropriate order follows.

### ORDER

**AND NOW,** this 31st day of March, 2005, in accordance with the foregoing Memorandum Opinion, **IT IS HEREBY ORDERED** that Bedford Reinforced Plastics, Inc.'s Motion to Compel 1) The Production of Documents Based on Waiver of Privilege and 2) The Continued Deposition Once the Underlying Documents are Produced (Document No. 88–1) is hereby **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff is directed to produce for inspection and copying all documents and things related to the subject matter of prior art and patent prosecution of the '378, '118, or related patent applications as requested by Defendant, Bedford Reinforced Plastics, Inc. This production shall be accompanied by a revised privilege log and shall take place no later than 30 days from the date of this Court's Order.

**IT IS FURTHER ORDERED** that Plaintiff shall continue the Rule 30(b)(6) deposition regarding the prosecution of the '378 and '118 patents within 30 days after the production of the privileged documents.

**IT IS FURTHER ORDERED** that Bedford Reinforced Plastics, Inc.'s Motion for Leave to File Surreply on Motion to Compel (Document No. 92–1) is rendered moot.